## THE DISTRICT OF COLUMBIA.

### THE YOMACHICHI.

### NORFOLK & WASHINGTON, D. C., STEAMBOAT CO. v. UNITED STATES et al.

### Nos. 5603, 5627.

District Court, E. D. Virginia.
Oct. 23, 1933.

Baird, White & Lanning, of Norfolk, Va., for libelants.

H. H. Rumble, Sp. Asst. to Atty. Gen., and Allan D. Jones, of Newport News, Va., for respondents.

WAY, District Judge.

The collision between the steamship District of Columbia and the motorship Yomachichi, the subject of the controversy involved in the above entitled causes, occurred about 6:23 a. m., November 29th, 1932, at a point approximately midway between Old Point Comfort dock situate on the north side, and Fort Wool (the Rip Raps) situate on the south side, of the main channel leading from Hampton Roads to Chesapeake Bay and the Virginia Capes.

The District of Columbia is a passenger and cargo steamer owned by the Norfolk and Washington, D. C., Steamboat Company and is regularly operated by that company between Washington and Old Point Comfort and Norfolk, Virginia. She is 297.8 feet long, 51 feet in width, 16.3 feet in depth and of 2,158 gross and 1,240 net, tons burden. The motorship Yomachichi is a merchant vessel 401.9 feet long, 54.2 feet wide and 31.3 feet in depth and of about 5,868 gross and 3,673 net, tons burden. That vessel is owned by the United States and at the time of the collision was operated by the Roosevelt Steamship Company.

On the occasion in question, the District of Columbia was inward bound from Wash-

ington to Old Point Comfort, and Norfolk, and the Yomachichi was proceeding outward, from Norfolk to New York, and thence to India. The wind was to the north, the tide flood and visibility was good. The Yomachichi had a full complement of officers and men, and in addition, had a Virginia state pilot aboard. Before leaving the Army Base, her engine, steering gear, whistle, running lights and telegraph were tested and found in order. As she proceeded down the channel, her chief officer was stationed in the pilot house by the telegraph; the helmsman, at the wheel; the master, on the starboard wing of the bridge, and the pilot was back and forth between the pilot house and the bridge in the discharge of his duties. As the District of Columbia proceeded inward from Thimble Shoal light, her master was at his post on duty; her quartermaster, at the wheel; a lookout was stationed at or near her stem, and her lights, steering gear and other apparatus were in order.

The District of Columbia left Washington at 6:30 p. m., November 28th, and passed Thimble Shoal light about 6:04 on the morning of the 29th. The Yomachichi left the Army Base piers at Norfolk, where she had been taking on cargo, about 5:20 a. m. on the 29th. When the Yomachichi was about abreast or a little past buoy No. 3, off Sewall's Point spit, which occurred about 6:12 a. m., her navigators observed the District of Columbia to the eastward of buoy No. 17, which buoy is located between Fort Wool and Thimble Shoal lighthouse and is on the southerly side of the channel.

The District of Columbia was well to the southward of mid-channel and was proceeding on a westerly course which was changed to a west southwest course about the time she passed buoy No. 17. Her range lights were open to the southward. She maintained this course until she reached a point to the west of a line drawn from Fort Wool to Old Point Comfort dock, and approximately a quarter of a mile from the southern side of the channel.

At the time the Yomachichi's navigators first observed the District of Columbia, the Yomachichi's course was about N. 35° East true, which was changed to 40° true, and later to 50° true, following changes in the general course of the channel. These were the only vessels under way in that vicinity at the times material to this controversy.

The Yomachichi, from the time she first observed the District of Columbia until her engines were stopped prior to the collision, was proceeding at about ten (10) miles per hour. The District of Columbia was proceeding at approximately twelve (12) miles per hour up to the time she began to change her course as hereinafter described. Due to her swing and change of course and probably in a measure to the effect of the tide, then flood, the District of Columbia appeared for a brief period to those on the Yomachichi to slacken her speed, although as a matter of fact her engines were not stopped or slowed down, and after she swung to starboard and straightened up on her new course, she went forward at her former speed until her master ordered her full speed ahead, which order was given shortly before the impact.

As already stated, the District of Columbia was well to the southward of mid-channel and was proceeding on a west southwest course until after she had passed Fort Wool, while the Yomachichi was proceeding on a northeasterly course and was about mid-channel, so that had each vessel maintained its course without material change therein, they would have passed starboard to starboard about 300 or 400 yards apart.

When the District of Columbia reached a point to the west of a line drawn from Fort Wool to Old Point Comfort dock, about a quarter of a mile from the southern side of the channel and approximately 600 or 800 yards from the Yomachichi, her master ordered her helm hard aport, thereby swinging her to starboard and quickly changing her course from west by south to a north or north northeast course. (The exact bearings and courses of the District of Columbia are not stated in the testimony.) This maneuver of the District of Columbia was made for the purpose of crossing to the north side of the channel to make a flood tide landing at Old Point Comfort dock, which is the customary maneuver for Bay boats of the District of Columbia's type intending to make flood tide landings at Old Point dock when the wind is to the northward.

There is substantial conflict in the testimony as to the point the District of Columbia had reached when she thus changed her course. The testimony of Captain Posey, master of that vessel, is to the effect that it was considerably farther to the eastward than the point just indicated by the court. However, the clear preponderance of the testimony and the maneuver which that vessel intended to make show that the point

designated on Exhibit "Dist. of Col. No. 1," by Captain Posey as being the place where the District of Columbia began to swing to starboard, is decidedly too far to the eastward.

The new course of the District of Columbia, if maintained, necessarily carried her directly and quickly across the Yomachichi's course. The change in her course opened her red lights to the Yomachichi for the first time when the two vessels were probably not over four or five hundred yards apart. Very shortly after the District of Columbia's red lights opened to the Yomachichi, and as the District of Columbia straightened up on the new course, she blew one short blast, indicating for the first time, her intention to cross the bow of the Yomachichi. The Yomachichi immediately answered the one blast with the danger signal of four blasts, followed by two short blasts, which latter were repeated, and almost simultaneously ordered her helm hard astarboard. The District of Columbia answered these signals with another one blast, but did not slacken her speed or alter her course. The navigators of the Yomachichi gave the hard astarboard order first and before ordering "stop," so as to steer that vessel to port, the Yomachichi being a right hand screw vessel, and followed that order as quickly as proper navigation of the Yomachichi under the circumstances would permit by "stop" and "full-astern," orders. All three orders were promptly executed.

The master of the District of Columbia in his testimony in chief describes the maneuvering of his vessel as follows:

"Q. And how did that light" (on the Yomachichi) "show?

"A. It was right ahead at that time.

"Q. What did you do when you saw this light?

"A. There was nothing to do. It only showed a white light. She was way up the river. So, I kept coming and just about a little while after that I swung about two more points, I saw a dim green light and *I saw it was a ship under way* but still we had plenty of room so I blew him one whistle.

"Q. You had swung about three points?

"A. Yes.

"Q. When you observed the green light?

"A. Yes.

"Q. How was that showing, off what part of your ship?

"A. Well, *off the port bow, on my port bow.*

"Q. And you blew one whistle signal?

"A. One signal to let him know I was directing my course to starboard.

"Q. Did you make any change in your speed?

"A. No.

"Q. Did you make any change in the helm?

"A. Not at all, never taken a spoke off her.

"Q. Tell the court just what happened after that, Captain, in your words, please.

"A. Well, when I blew him one whistle he come back with—he didn't have a steam whistle, a kind of horn—with several whistles I could not tell whether three of four. I felt it was no necessity for him blowing me any danger signal way off there, he was about off there, and I said he is not blowing for me. Probably he is going to Quarantine and blowing for the doctor, which they do often in that direction. He was further to the southward" (The witness presumably intended to say northward—See his testimony, p. 26 of Reporter's transcript) "side of the channel than I had ever seen a ship come down. In a little while he blew two and then two more right on top of that. I didn't know what he was doing. I thought he was probably blowing for the doctor first. He seemed to get good speed. At first he was going right slow. I said to the quartermaster (objection)—

"Q. Just tell what you did.

"A. You don't want me to tell what I spoke to the quartermaster?

"Q. Not to the quartermaster.

"A. I noticed he was starboarding his wheel trying to head me off. I had no time to back then. He was trying to head me off, cut across my bow and he ran into us. So, I gave him one whistle and kept going.

"Q. Did you give any orders to your engine room?

"A. When I saw he was going to run into us.

"Q. What was that?

"A. I said 'Open her full speed.' I had no chance to back."

At the time the first one blast was given by the District of Columbia the vessels were in such proximity that a collision was inevitable if the District of Columbia maintained her speed and course. The collision

occurred at a point south or south southeast of Old Point dock, probably slightly to the northward of mid-channel and to the west of a line drawn from Fort Wool to said dock. At the time of impact, the District of Columbia had not changed her new course, but was proceeding on a north northeast course under the full speed order. The Yomachichi, due to the execution of the three emergency orders above referred to, had swung from 50° to 44° true. She continued to swing to port until she cleared the District of Columbia, at which time her course was about 25° true. ·

As the two vessels came together, the starboard bow of the Yomachichi struck the super-structure of the District of Columbia on the latter's port side about 137 feet from the stem. Neither vessel was seriously damaged below the water line. The entire damages were not great, taking into consideration the sizes of the vessels involved, their speed shortly before the collision, and that of the District of Columbia at the time of impact.

In the respective libels, each vessel has charged the other with numerous faults, particularly in the manner in which the other vessel was maneuvered shortly before the collision.

Against the Yomachichi it is urged that she was not in charge of competent officers and crew, properly stationed and diligently performing their duties, did not display proper lights, and was on the wrong side of the channel; that although the District of Columbia was on her starboard bow, she did not keep out of the latter's way, but attempted to cross ahead of that vessel; that she answered the District of Columbia's one signal with two signals and went to port; that she was proceeding at too great speed, and failed seasonably to slacken her speed, stop or reverse; in brief, that she failed to avoid the collision.

On the other hand, it is charged that the District of Columbia was not in charge of competent officers and crew, was on the wrong side of the channel, failed to give timely and proper signals of her intention to change her course, and that when the two vessels were in such close proximity as to make it impossible for her to cross the bow of the Yomachichi, she nevertheless blew one blast, failed to heed the danger signal given by the other vessel, steadied her helm on a north northeast course, speeded up her engines and attempted to cross the Yomachichi's bow, instead of slowing down, stopping or reversing and passing under the stern of the Yomachichi.

In the oral arguments, proctors for each vessel urged that the collision was solely the fault of the other. In the written brief afterwards filed on behalf of the District of Columbia, it is said that "after closer study of the testimony and the authorities, it must be conceded that the District of Columbia was not to be so regarded, because greater caution ought to have been exercised by her as to the position and movements of the vessel on which she saw lights, even though her master thought, and the evidence seems to show, her navigation would have had no bad consequences if there had been cooperation on the part of the Yomachichi."

I think the testimony and the circumstances demonstrate the necessity of that concession, since it clearly appears from the testimony of the District of Columbia's master that he failed to ascertain the position, and movements of the vessel on which he saw lights, and simply disregarded that vessel, or at most, indifferently assumed that she was signaling for the purpose of going into quarantine. That the District of Columbia was at fault in that respect, and at fault also in suddenly changing to and persisting in a course manifestly fraught with imminent danger of collision seems too apparent to necessitate an extended discussion of the testimony with respect to that particular phase of the case.

Therefore, the sole question remaining for the court to determine is whether the Yomachichi was also at fault in causing the collision in question; that is, whether after the District of Columbia announced her change of course, the Yomachichi failed to take promptly all steps then open to her to avoid a collision.

Whose fault created the situation fraught with danger of collision? Careful consideration of the circumstances disclosed by the testimony fails to reveal any act or neglect on the part of the Yomachichi which brought about, or contributed to bring about, the situation in which the two vessels were involved just before the collision, unless her act of proceeding about mid-channel at a speed not shown to be excessive under the circumstances, was such. She was in charge of competent officers and crew properly stationed and in the performance of their duties. Her lights complied with the requirements. The lookout and master of the other vessel saw them in ample time, but failed to regard them. While the Yomachi-

chi was over farther to the northward than is probably usual for outward bound vessels, her presence there and the fact that she was under way were known to the master of the District of Columbia in time for needful precautions to be taken by that vessel. The Yomachichi's being in mid-channel in no way interfered with proper navigation of the District of Columbia, since the latter vessel was well over to the south or its port side of the channel, and had it not suddenly changed its course, the two vessels would have passed starboard to starboard well apart.

With respect to the navigation of the District of Columbia, I find that up to the time she gave the first one blast, she had not indicated her intention to take a course which would cause her to cross the bow of the Yomachichi. Her movements had been such as to cause the other vessel reasonably to assume that she would pass under its stern for the purpose of making a landing at Old Point. The fact that her intention eventually to cross to the other side of the channel was understood by the pilot on the Yomachichi does not materially alter the situation. Such maneuver and passing under the stern of the Yomachichi were entirely consistent under the circumstances, while ordinary prudence and caution clearly dictated the latter rather than the maneuver which the District of Columbia actually undertook to execute. Therefore, it appears to the court that the acts of the District of Columbia in suddenly changing her course, in failing to regard either the lights or movements of the other vessel in the face of the danger of collision incident to her new course, a danger which ought to have been manifest to her, and in persisting in such course after the danger signal was given, alone created the critical situation which quickly followed. That the District of Columbia took no steps to avoid the collision after the danger became apparent, other than to speed up, is manifest from the testimony of her master, while careful consideration of the circumstances disclosed by the testimony convinces the court that if the District of Columbia, upon receiving the danger signal from the Yomachichi, had taken timely and appropriate steps to that end, the collision would have been avoided. With respect to that phase of the case, Captain Posey, master of the District of Columbia, testified on cross-examination, as follows:

"Q. Now, Captain, if you had stopped and backed after blowing one whistle and after getting this danger signal from the Yomachichi, would not the collision have been avoided?

"A. I did not get any whistles with the knowledge as to danger signal. Some said it was three and some said four.

"Q. Well, suppose it turned out that it was a danger signal?

"A. Yes, I could have stopped and backed then, sure, but I would have been going against what I blew him. I blowed him one whistle. I would have been going against what I blew then.

"Q. If you had stopped and backed then when he blew his danger signals, the collision would have been avoided, wouldn't it?

"A. Probably it would, if either one of us had, if either one of us had at that time, because we was a long ways apart."

Was the Yomachichi at fault in failing to keep out of the way of the District of Columbia, and did she fail seasonably to slacken her speed, stop and reverse?

At the trial, it was urged that this was a crossing case, but that contention seems to have been abandoned by the District of Columbia in the brief. It is still urged that the Yomachichi should have slowed down or stopped as soon as the District of Columbia began to swing to starboard. It would seem rather strict to hold that that vessel should have anticipated what was in the minds of the District of Columbia's navigators. As already indicated, I think that the Yomachichi was not required in the exercise of due care to assume under the circumstances that the District of Columbia would attempt to cross her bow until the first one blast was given by the District of Columbia. After that blast, she did all reasonably possible for her to do. The danger signal was given immediately, but was not heeded by the District of Columbia. And in that connection it may not be amiss to add that it is not readily perceived why the District of Columbia did not understand the danger signal, as it appears from the testimony of witness Purcell, a member of the crew of the Old Bay line steamer then tied up at Old Point dock, fully as far away from the Yomachichi as the District of Columbia then was, that although inside his vessel, he heard and understood the signal which was given by the Yomachichi.

The danger signal was immediately followed by hard astarboard, stop and reverse orders, given and executed as rapidly as proper maneuvering of the Yomachichi

would permit. Stress is laid upon the giving of the hard astarboard order by the Yomachichi before the stop order. But it was necessary to give the orders in that sequence because the Yomachichi is a right hand propeller vessel. To have attempted to stop and reverse before giving that vessel headway and steerage to port, would have tended to throw its bow to starboard and towards, instead of away from, the District of Columbia, the very opposite of what the Yomachichi's navigators desired to accomplish.

Emphasis is also laid upon the time apparently consumed by the Yomachichi in giving and executing the three emergency orders referred to. After hearing the explanation of the witnesses, particularly those of the captain and pilot of the Yomachichi, it is not easy to believe that much, if any, time was actually lost by that vessel after the first one blast was received from the District of Columbia. The entries in the log of the Yomachichi directly material to this point are approximate only. The recorder set down each time except one during the existence of the emergency, the nearest minute that an order was given or that something occurred. He did not attempt to give the exact second. But if the Yomachichi were absolutely bound by the entries in her log and not permitted to explain them by showing that less than two minutes was actually consumed in giving and executing the three orders, the court would still not be prepared to conclude under the peculiar circumstances of the case, that the Yomachichi should be held to such strict responsibility. It should be kept in mind that her efforts to avoid a collision were unaided by any corresponding efforts on the part of the other vessel. However, the court has concluded from the testimony that probably something less than two minutes was actually consumed, and, as already stated, that the Yomachichi did all reasonably possible for her to do to avoid the collision.

█ The District of Columbia strongly relies also upon rule 7 of the Pilot Rules, which provides as follows:

"When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her starboard side shall keep out

of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

"If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

As the court views the evidence, it signally fails to present a case such as contemplated by the first paragraph of that rule. Instead, it presents the case of two vessels proceeding on parallel courses, which would have caused them to pass starboard to starboard some distance apart, had not one of them without timely warning suddenly changed its course to such an extent as to carry it directly and quickly across the other's bow. Ordinary prudence and caution made it the duty of the District of Columbia under the circumstances disclosed to cross the stern of the Yomachichi instead of taking the course she did. Furthermore, when that vessel received the danger signal from the Yomachichi, it was its duty to stop, and also to reverse if necessary. Had the District of Columbia crossed the stern of the Yomachichi, or had she stopped and backed upon receiving the danger signal, the collision would have been avoided.

█ The suggestion that the Yomachichi should have steered to starboard instead of to port, to avoid a collision, it seems to me is in the very teeth of the evidence. Even if it were conceded that the Yomachichi erred in that maneuver, I would still be strongly inclined to the view that it was an error committed in extremis for which that vessel should not be held so strictly accountable, since the emergency was created by the fault of the other vessel. However, the clear weight of the testimony convinces the court that if the Yomachichi had steered to starboard instead of to port, in all reasonable probability the collision would not have been avoided, but would have been decidedly more serious than it was.

For the foregoing reasons a decree adjudging the District of Columbia to be solely liable for the collision will be entered upon presentation.